UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLENE BRIGGS, ET AL                    CIVIL ACTION

                                         NO: 12-2145 c/w
                                         13-5335 and 13-
                                         5342

VERSUS
                                         **APPLIES TO 13-5342**

TANGIPAHOA PARISH SHERIFF                SECTION: **"J" (4)**
DANIEL EDWARDS, ET AL

<u>**ORDER**</u>

Before the Court is Defendants Daniel Edwards ("Sheriff Edwards"), William Phebus ("Deputy Phebus"), and Steven Redmond ("Lt. Redmond")'s **Motion for Partial Summary Judgment (Rec. Doc. 160)**, Plaintiff Carl Galmon, Sr. ("Mr. Galmon")'s opposition thereto (Rec. Docs. 162), and Defendants' reply memorandum to the same (Rec. Doc. 183). Defendants' motion was set for hearing on February 12, 2014, on the briefs. The Court, having considered the motions and memoranda of counsel, the record, and the applicable law, finds that Defendants' motion should be **GRANTED IN PART AND DENIED IN PART** for the reasons set forth more fully below.

1

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This matter arises from wrongful death claims under 42 U.S.C. § 1983 and Louisiana state law claims filed on behalf of Cjavar "Dee Jay" Galmon ("Dee Jay") and by Mr. Galmon individually. It is undisputed that, in the midst of a scuffle outside of a nightclub in Tangipahoa Parish, a bullet from Deputy William Phebus ("Deputy Phebus")'s weapon mortally wounded Dee Jay. Mr. Galmon asserts two theories in this matter: (1) that Deputy Phebus shot and killed Dee Jay intentionally or, alternatively, (2) that Deputy Phebus's intentionally drawn weapon accidentally discharged, mortally wounding Dee Jay. In support of the Mr. Galmons' second theory, it is alleged that, at the request of Deputy Phebus, Lieutenant Steven Redmond ("Lt. Redmond") had previously installed an after market trigger in Deputy Phebus's service weapon which made it fire more easily; and, as a result, any twitch in Deputy Phebus's finger would have caused the gun to fire. It is further alleged that, following the shooting, Defendants left Dee Jay lying on the ground without proper medical treatment.

Several lawsuits have arisen from this incident. Willene Briggs and Kim Brumfield, Dee Jay's mother and sister, initially filed a complaint against Deputy Phebus and Sheriff Edwards on

2

August 21, 2012.[1] On April 30, 2013, Mr. Galmon, Dee Jay's father, intervened in the original suit. On August 9, 2013, after learning in a deposition that Lt. Redmond installed the after market trigger, Willene and Allen Briggs, Brumfield, and Pendleton (collectively, "Briggs") filed suit against Lt. Redmond and Sheriff Edwards alleging that they are liable under 42 U.S.C. § 1983 and various state laws. Mr. Galmon filed a nearly identical suit on the same day. The Court consolidated all three actions. The Briggs Plaintiffs settled their claims with the Defendants in December 2013 and were subsequently dismissed from this matter, thus Mr. Galmon is the only remaining plaintiff in this matter. Defendants filed the instant motion for partial summary judgment on January 28, 2014.

## PARTIES' ARGUMENTS

### A. Defendant's Arguments

Defendants argue that Mr. Galmon's excessive force claim against Deputy Phebus must fail because the shooting was accidental. Defendants argue that for the Fourth Amendment to apply, there must be a seizure, and no such seizure occurred here because a seizure only occurs through means intentionally

---

[1] Briggs and Brumfield later amended their complaint to add Kendra Pendleton and Allen Briggs, Jr., Dee Jay's siblings, as Plaintiffs and Columbia Casualty Company as a defendant.

applied. Defendants further argue that, even in cases where courts found that an accidental shooting constituted excessive force, the individual officer was entitled to qualified immunity. Defendants aver that Deputy Phebus is entitled to qualified immunity because the scene was chaotic, he was in the middle of handcuffing an armed perpetrator, and Dee Jay voluntarily interjected himself into this deadly force situation, making the fact the Dee Jay was unarmed irrelevant.

As to Plaintiff's failure to train and supervise claims, Defendants contend that Plaintiff has failed to show that there has been a pattern of similar incidents, which is a required showing for these types of claims. Furthermore, Defendants argue that Lt. Redmond is not liable for a constitutional violation because this Court has already concluded that his installation of the hair trigger in Deputy Phebus's weapon cannot logically cause Deputy Phebus's decision to draw his weapon and point it at Dee Jay.

Regarding the deliberate indifference in hiring claim, Defendants aver that nothing in Deputy Phebus's record prior to being hired by Tangipahoa Parish Sheriff's Office ("TPSO") indicated that he was prone to accidental shootings; therefore, the parish is not liable.

Finally, Defendants argue that they did not deprive Dee Jay

4

of medical care because emergency medical services were immediately called by other officers and Lt. Redmond was not even on the scene until several hours after the shooting occurred.

**B. Plaintiff's Arguments**

Plaintiff contends that Dee Jay was "seized" when Deputy Phebus drew his weapon and pointed it at him, and that this seizure was unreasonable based on the evidence showing that Dee Jay committed no crime, did not threaten, touch, or disobey anyone, was unarmed, was showing his empty hands, and was 26 feet away from the officers. Plaintiff further contends that Deputy Phebus's claims that the shooting was accidental are self-serving and that a jury should decide if these claims are credible; but, even if the shooting was accidental, there is still a constitutional violation. Plaintiff further argues that Deputy Phebus should not be granted qualified immunity because the right to be free from the use of deadly force absent an immediate threat to the officer is clearly established.

Plaintiff further contends that there is official liability for excessive force under a ratification theory. Plaintiff points out that Deputy Phebus was not disciplined about the shooting or about having an after-market trigger, which is evidence of a policy of "turning a blind eye."

As to the hiring of Deputy Phebus, Plaintiff avers that TPSO

5

is liable for deliberate indifference in hiring. Plaintiff argues that Deputy Phebus had a long record of indiscretions and concealed such facts on his application, and that TPSO would have discovered these facts had it adequately screened him.

Finally, Plaintiff briefly argues that the parish and Lt. Redmond are liable for a failure to train Deputy Phebus, and that both Deputy Phebus and Lt. Redmond are liable for failing to render medical care to Dee Jay.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little, 37 F.3d at

1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." <u>Delta</u>, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" <u>Int'l Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." <u>Id.</u> at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. <u>See</u> <u>Celotex</u>, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. <u>See</u> <u>id.</u> at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. <u>See,</u>

7

e.g., id. at 325; Little, 37 F.3d at 1075.

**DISCUSSION**

**A. 42 U.S.C. § 1983 Claims based on Fourth Amendment Violations**

Defendants contend that they are entitled to summary judgment on all of Mr. Galmon's § 1983 claims based on a violation of the Fourth Amendment of the United States Constitution. Mr. Galmon's Fourth Amendment claims, which are discussed fully below, include: excessive force claims against Deputy Phebus in his individual capacity and Sheriff Edwards in his official capacity, failure to train and/or supervise claims against Lt. Redmond in his supervisory capacity and Sheriff Edwards in his official capacity, and a deliberate indifference in hiring claim against Sheriff Edwards in his official capacity.

**1. Excessive Force**

**a. Individual Liability of Deputy Phebus**

Mr. Galmon argues that regardless of whether Deputy Phebus intentionally or accidentally shot Dee Jay, the force that he applied was excessive to the need and Deputy Phebus should be held liable for violating the Fourth Amendment. Defendants argue that Deputy Phebus's use of force was reasonable in light of the circumstances, thus there is no constitutional violation. Alternatively, Defendants argue that if there was a

8

constitutional violation, Deputy Phebus is entitled to qualified immunity.

### i. Constitutional Violation

When an excessive force claim arises from an arrest, stop, or seizure, the claim is most properly analyzed under the Fourth Amendment's reasonableness standard.[2] Graham v. Connor, 590 U.S. 386, 394-395 (1989). This standard requires Mr. Galmon to prove that: (1) the decedent suffered an injury, (2) the injury directly and uniquely resulted from the application of force that was clearly excessive to the need, and (3) the excessive use of force was unreasonable at the time of the incident. Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999). Here, it is undisputed that Dee Jay suffered an injury and that such injury resulted from the application of force. Further, the evidence indicates that the deadly force used was excessive to the need considering the facts that the decedent was unarmed and had his hands in the air. (State Rpt., Rec. Doc. 160-4, pps. 24-35) Therefore, the issue for the Court to resolve is whether the excessive use of force was objectively unreasonable at the time of the incident.

_____

[2] Dee Jay was "seized" or "detained" by either (a) intentionally being shot by Deputy Phebus, or (b) by intentionally having a weapon pointed at him;" therefore, he is an arrestee that is granted this right to medical care. See, Flores v. City of Palacios, 381 F.3d 391,396 (5th Cir. 2004)("An officers seizes a person when he, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" through means intentionally applied.)

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 590 U.S. 386 at 396 (internal citations omitted). When balancing these interests, the Court should consider the facts and circumstances surrounding the case, the severity of the crime at issue, the severity and the immediacy of the threat posed by the suspect, and whether the suspect was attempting to resist arrest. Id. Evidence must be considered as it bears on what an objectively reasonable officer would have done under the circumstances. Watson v. Bryant, 432 Fed. Appx. 453, 458 (5th Cir. 2013). The reasonableness of an officer's actions should be viewed from the perspective of the officer at the scene,  and the Court should avoid the temptation to use hindsight in its analysis and should not consider the officer's underlying intent or motive. Id.; Graham, 590 U.S. at 396-97.

Though the intent of the officer is irrelevant, the two theories offered in this case  present two different acts–shooting and drawing a weapon–both of which must be evaluated separately. If it is determined that Deputy Phebus made the conscious decision to shoot Dee Jay, a jury could reasonably

10

find a constitutional violation based on Plaintiff's evidence that Dee Jay was about 26 feet away, had stopped and put his hands in the air, and was not committing any sort or crime. (State Rpt., Rec. Doc. 160-4, pps. 24-35; Scene Drawing, Rec. Doc. 162-4) There is, however, a factual issue concerning whether or not Deputy Phebus actually decided to shoot Dee Jay because Deputy Phebus vehemently and consistently denies that he intentionally shot Dee Jay. He contends that he drew his weapon and addressed Dee Jay with loud verbal commands to stop, but then accidentally fired. Deputy Phebus's deposition testimony, however, reveals that he remembers very little from the time of the incident and cannot provide many details about the shooting. Given the dearth of evidence, this issue essentially hinges on the credibility of Deputy Phebus's testimony; therefore, the resolution of this issue is best left for a jury. Delta & Pine Land Co., 530 F.3d at 398.

Alternatively, if it is determined that Deputy Phebus deliberately decided to draw and point his weapon, but that the shooting was accidental, there will not be a factual issue because Defendants agree that this occurred. But, there will be an issue concerning whether it was unreasonable for Deputy Phebus to point his weapon at Dee Jay. Because both sides have presented

11

evidence[3] on this issue, the Court must allow a jury to consider the weight and sufficiency of the evidence offered, making summary judgment improper. Id.

### ii. Qualified Immunity

The Supreme Court has clearly laid out a two-step inquiry to be applied in a qualified immunity analysis. The first inquiry asks whether "the facts alleged show the officer's conduct violated a constitutional right" when taken in a light most favorable to the injured party. Saucier v. Katz, 533 U.S. 194, 201 (2001); Wallace v. Cnty. of Comal, 400 F.3d 284, 289 (5th Cir. 2005). Then, and only if a constitutional violation is found, the second inquiry asks "whether the right was clearly established." Id. As discussed above, Mr. Galmon has submitted

---

[3] Deputy Phebus contends that his actions were justified because the scene was chaotic and rapidly moving, and the evidence corroborates that Deputy Phebus: (1) had just disbanded a large bar fight; (2) had just given chase to Marquis Martin ("Martin") who was an armed, fleeing suspect in a prior shooting that evening; (3) was in the process of subduing, handcuffing, and searching Martin; and (4) heard footsteps rapidly approaching the scene. Deputy Phebus further offers that he heard the word "gun," but some of the testimony of other eyewitnesses does not support his assertion.. (See Various Statements in State Rpt., Rec. Doc. 160-4, pps. 24-35)

Mr. Galmon, on the other hand, argues that despite Deputy Phebus's subjective fear, the evidence shows that his actions were unreasonable because: (1) there were several other officers in the area for back-up, including one officer with Deputy Phebus who could actually see Dee Jay; (2) Dee Jay was 26 feet away with a ditch separating he and Deputy Phebus; (3) Deputy Phebus could not see Dee Jay, did not know Dee Jay, and had no reason to suspect that he was armed; (4) Dee Jay had committed no crime; (5) Dee Jay was not fleeing or resisting arrest; and (6) Dee Jay had obeyed another officer's command to stop and raise his arms in the air. (See Various Statements in State Rpt., Rec. Doc. 160-4, pps. 24-35; Scene Drawing, Rec. Doc. 162-4)

12

enough evidence to create a genuine issue of material fact on the question of whether Deputy Phebus's conduct violated the Fourth Amendment; therefore, **t**he dispositive question is whether the right that he violated was clearly established.

"[I]n determining whether a right is clearly established [the Court must consider] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202. The question of whether an officer's conduct is reasonable is a question of law, but if the underlying facts of the event are in dispute, some further fact-finding may be required. <u>See</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 615(1999) (noting that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). As such, the Court is "unable to make the determination of the objective reasonableness of the officer's activities 'without settling on a coherent view of what happened in the first place.'" <u>Mangieri v. Clifton</u>, 29 F.3d 1012, 1016 (5th Cir. 1994) (<u>citing</u> <u>Lampkin v. City of Nacogdoches</u>, 7 F.3d 430, 430 (5th Cir.1993). Here, the Court will not be able to settle on a coherent view of what happened until a jury makes a credibility determination concerning whether Deputy Phebus intentionally shot Dee Jay. Therefore, summary judgment on Deputy Phebus's qualified immunity defense is inappropriate at this

13

time.

### b. Official Liability

Plaintiff asserts that the Parish is liable based on its ratification of Deputy Phebus's actions. Though this claim is rarely successful, the Fifth Circuit has not ruled out the possibility of official liability for excessive force when officials ratify both the officer's decision and the basis for the decision. Hobart v. City of Stafford, 916 F.Supp.2d 783, 795 (S.D. Tex. Jan. 9, 2013) (pointing out that, despite difficulties reconciling § 1983 liability with ratification theories and inconsistent opinions on the issue, the Fifth Circuit "apparently tolerates such claims.") "[A] municipality is not liable under the ratification theory where a Police Chief accepts his officers' version of events, so long as 'that version did not show that the deputies' actions were manifestly indefensible." Id. citing Allen v. City of Galveston, Tex., No. 06-467, 2008 WL 905905, at *8 (S.D.Tex. March 31, 2008)  In Hobart, for example, the Court allowed the plaintiff to proceed on a ratification theory after finding that a factfinder could reasonably conclude that "firing a weapon, while apparently losing consciousness, in response to being struck by a mentally ill individual who was known to be unarmed, without any awareness of where innocent bystanders were positioned, was 'manifestly indefensible.'" Id.

at 797. In reaching this conclusion, the Court cautioned that "ratification is rarely a viable theory in this Circuit. If only a few of the facts in this case were different, this Court would be obliged to conclude that no reasonable jury could find that the City was liable based on ratification." Id. at 798. In a slightly different vein, the court in Santibanes v. City of Tomball, Tex., 654 F.Supp.2d 593 (S.D. Tex. Sept. 4, 2009) allowed a ratification claim to survive summary judgment where the Sheriff did not adequately investigate and discipline the officer. Santibanes, 654 F.Supp.2d at 613-14. The Court found that such failures by the Sheriff indicated that it was a policy within the department that superiors would "turn a blind eye" to improper conduct. Id.

Here, the facts are somewhat parallel to Santibanes and to Hobart. Deputy Phebus continues to be employed, and in fact never lost pay. (Rec. Doc. 127-3, pps. 95-96) Like in Santibanes, there is no evidence that TPSO addressed the fact that Deputy Phebus's weapon was improperly modified or that he violated policy regarding drawing his weapon in the "ready to fire" position. Also, as in Hobart, a reasonable jury may be able to conclude that it is "manifestly indefensible" to shoot at an unknown subject without knowing the exact location of the subject or having any credible indication that the subject was armed,

15

dangerous, or committing a crime. Accordingly, in light of the proffered evidence, and the fact that Defendants' did not dispute that <u>Hobart</u>[4] would apply to these facts, the Court will deny summary judgment on this claim.

## 2. Deliberate Indifference in Hiring

A government entity is liable for deliberate indifference in hiring "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the [hiring] decision ... would be the deprivation of a third party's federally protected right." <u>Aquillard v. McGowen</u>, 207 F.3d 226, 230 (5th Cir. 2000). "Any finding of culpability must depend on a finding that this officer was likely to inflict the **particular injury** suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." <u>Id.</u> (emphasis added) A showing of deliberate indifference requires that the official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Smith v. Brenoettsy</u>, 158 F.3d 908, 912 (5th Cir.

---

[4]Though Defendants technically argue that <u>Santibanes</u> does not apply, their argument is conclusory and does not elaborate upon their specific reasoning for not applying and ratification theory.

1998); Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 384 (5th Cir. 2005)(a showing of deliberate indifference in an excessive use of deadly force case requires proof that officer had previously used a "deadly weapon resulting in harm to a citizen in a context similar to the present case.").

For example, in Aquillard, the Fifth Circuit reversed a jury verdict finding deliberate indifference in hiring because the officer's prior conduct, which indicated that he could be violent and/or harassing was insufficiently connected to his act of shooting an arrestee. The court reasoned that despite some evidence of harassing and violent conduct, the officer "had never wrongfully shot anyone before, nor did his record reveal him to be likely to use excessive force in general or possess a trigger-happy nature in particular." Id. (internal citations omitted). Further, in Gros v. City of Grand Prairie, 209 F.3d 431 (5th Cir. 2000), the Fifth Circuit reversed the district court's denial of summary judgment and held that the plaintiff's evidence of the officer's prior aggressive behavior was not sufficiently connected to the excessive force claims. Gros, 209 F.3d at 435. In Gros, the plaintiffs produced:

> scattered statements in Rogers's pre-employment file that suggest he was sometimes too aggressive for UTA's campus police department. There are also letters of reprimand and sustained complaints for being overbearing and abusive during a traffic stop. But

17

> while these facts suggest that [defendant], like the
> county in *Aguillard,* might have been negligent in
> failing adequately to review Rogers's records and in
> ultimately deciding to hire him, they do not provide
> sufficient evidence of a deliberate indifference to
> constitutional rights.

Id. Ultimately, the court found that summary judgment should have been granted in favor of the defendants, reasoning that "[w]ith the benefit of hindsight, it is apparent that [the officer] was a bad hire, but there is insufficient evidence to show that [the defendant] was deliberately indifferent to plaintiff's constitutional rights when he made his hiring decision." Id. at 436.

Here, Mr. Galmon must show that TPSO was deliberately indifferent to the risk that Deputy Phebus would apply excessive force by shooting an arrestee based on what TPSO knew about Deputy Phebus's background at the time of hiring him. Mr. Galmon produced evidence of several incidents involving Deputy Phebus prior to TPSO's decision to hire him, including:

- two civil complaints filed in this district court in 2000. The first complaint alleged that Deputy Phebus, along with another officer, forced an inmate to strip and stand nude in the living area of the center, at which time the officers involved beat him. The plaintiff also alleged that the next day, Deputy Phebus and the other officer groped him and forced him to sign blank statements that the officers could fill in at a later time. Granier v. Hingle, 00-2699 (E.D. La. Nov. 20, 2000)(dismissed following settlement) (Rec. Doc. 162-14, 15). The second complaint alleged that Deputy

Phebus sprayed mace in an inmate's face and watched while another officer beat the same inmate. <u>Elmer v. Hingle</u>, 00-2700 (E.D. La. Nov. 20, 2000)(dismissed following settlement.) (Rec. Doc. 162-16, 17);

- a letter from a concerned citizen of Sorrento, Louisiana wherein the author alleges that Deputy Phebus continually stopped his wife and "rummaged through her car and purse with out [sic] asking," and followed her in her vehicle (Rec. Doc. 162-26);

- a letter from the Ascension Parish Sheriff to the Sorrento Chief of Police wherein the Sheriff complained that Deputy Phebus had traveled outside of Sorrento's jurisdiction, conducted an illegal search, and falsified the report following the search. (Rec. Doc. 162-21, p. 4);

- medical records showing that Deputy Phebus was taking anabolic steroids and Provigil.[5] (Phebus Medical Rec., Rec. Doc. 162-18, p.2)[6]

Here, record reveals that TPSO was not aware of any of the

---

[5] Provigil "is a prescription medicine used to improve wakefulness in adults who experience excessive sleepiness (ES) due to one of the following diagnosed sleep disorders: obstructive sleep apnea (OSA), shift work sleep disorder, also known as shift work disorder, or narcolepsy." <u>www.provigil.com.</u>; PubMed Health, Modafinil (Oral Route), <u>http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011255/</u> (last visited 3/12/2014 at 12:49 p.m.)

[6] Defendants contend in their Reply Memorandum that the one page medical record is irrelevant and contains hearsay. The fact that Defendant was on medication that can cause aggression is relevant to the claims at issue. Further, medical histories contained in medical records enjoy a presumptive reliability and are admissible under Federal Rule of Evidence 803(6); therefore, the Court finds that the record is admissible. <u>Phillips v. Gen. Motors Corp.</u>,. 99-3423, 2000 WL 1407896 (E.D. La. Sept. 25, 2000) ("Assuming defendant lays the proper foundation[...] the medical records [...] are exempt from the hearsay rule under Rules 803(4) and 803(6), because there is a presumption of reliability that attaches to statements relating to treatment and medical history in such records." )

above listed facts when it hired Deputy Phebus.[7] On his employment application, Deputy Phebus indicated that his only prior law enforcement position was as a part-time officer in Denham Springs, Louisiana, and that he voluntarily terminated that position to look for full-time employment. (TPSO App, Rec. Doc. 162-9, p.2). In a letter verifying Deputy Phebus's certification from the Lafourche Parish Sheriff's Academy, it is revealed that, in addition to the Denham Springs position, Deputy Phebus had two other full time positions–one with the Plaquemines Parish Sheriff's Office and one with the St. Gabriel Police Department–and one other part-time position with the Sorrento Police Department. (Commission's Ltr., Rec. Doc. 162-10) This letter was dated December 29, 2009 and was presumably used in determining whether Deputy Phebus should be hired; therefore, the Court will presume that TPSO knew of Deputy Phebus's other positions. Testimony from TPSO's corporate deposition further confirms its knowledge of at least some of his prior employment history. Specifically, TPSO knew that Deputy Phebus was "let go" after his probational period with the Sorrento Police Department, but TPSO also stated that it did not research this employment any

---

[7]In their Reply Memorandum, Defendants contend that much of this evidence is hearsay. The Court will not rule on this objection at this time, however, because it does not rely on this evidence in coming to its conclusion. (Rec. Doc. 183)

further once it received a letter of recommendation from Sorrento's police chief. (TPSO Depo., Rec. Doc. 160-12, p. 6, lns. 3-9) There is also evidence that Sheriff Edwards spoke with the Chief of Police of Denham Springs regarding Deputy Phebus, but it is unclear what the Sheriff learned in that conversation. (TPSO Depo., Rec. Doc. 160-12, p. 5, lns. 21-25).

Based on what TPSO actually knew, which is the relevant inquiry under Smith, this case is rather similar to the "scattered evidence" of negative reviews in Gros. At worst, TPSO should have noticed the discrepancy in Deputy Phebus's reported employment history and his actual history; however, that fact suggests Deputy Phebus's potential dishonesty, and not a potential to apply excessive force. Thus, that evidence only tends to probe that TPSO did not adequately review Deputy Phebus's record. Such an oversight does not amount to a constitutional violation. Further, even if the Court were able to consider all of the evidence gathered post-hiring, it still would not amount to a constitutional violation because it is not sufficiently connected to the allegedly unreasonable application of deadly force during an arrest. The excessive force claims arising from his employment in Plaquemines Parish were not based on a use of deadly force, but rather involved humiliation and physical beatings upon prison inmates. Accordingly, summary

21

judgment will be granted on Mr. Galmon's deliberate indifference in hiring claims.

### 3. Liability for a Failure to Train and/or Supervise

Mr. Galmon asserts that the evidence supports a finding of both official liability and individual liability on the part of Lt. Redmond. To succeed on such a claim, Mr. Galmon must prove:

1.   that defendants learned of facts or a pattern of inappropriate behavior by Deputy Phebus that pointed plainly towards the conclusion that he was applying excessive force when seizing and/or stopping citizens;

2.   that defendants demonstrated deliberate indifference toward the constitutional rights of Dee Jay by failing to take action that was obviously necessary to prevent or stop the excessive force; and

3.   that such failure caused a constitutional injury to Dee Jay.

Doe v. Taylor Indep. Sch. Distr., 15 F.3d 443, 454 (5th Cir. 1994).[8] In Doe, the court found that evidence of several concrete complaints of similar behavior in the two years leading up to the incident involved in the litigation was enough to satisfy the first prong of this test on summary judgment.

### a. Official Capacity Claim

In addition to the evidence listed above concerning Deputy

---

[8] In Doe, the Court was dealing with a school employee who was sexually abusing students; however, the framework of the Doe analysis is instructive and easily adaptable to the instant facts.

Phebus's pre-TPSO history, Mr. Galmon has submitted evidence showing that:

- in an evaluation of Deputy Phebus by Sgt. Finn, Sgt. Finn pointed out that Deputy Phebus inconsistently dealt with the public, often treated members of the public "firmly" or with an "attitude" and left them feeling "humiliated," and showed difficult relationships with "different ethnic groups." (Rec. Doc. 162-20); and

- Deputy Phebus asked Lt. Redmond to alter his weapon to make it easier to fire.

Based on this evidence, Mr. Galmon asserts that TPSO is liable for a failure to train or supervise Deputy Phebus. While the Doe court relied on a longstanding pattern, the language of the opinion indicates that the defendant need only learn of "facts" that point plainly towards the conclusion that Deputy Phebus was applying excessive force. The Court finds Mr. Galmon has produced enough facts for a reasonable jury to conclude that TPSO knew of such facts—specifically that Deputy Phebus was overly firm with the public and had requested and received an alteration to his weapon that would make it easier to fire. From these two facts alone, it is reasonable for a jury to conclude that TPSO was deliberately indifferent to a need to either train Deputy Phebus on the altered weapon or to supervise him to make sure he was not abusing his power. Accordingly, summary judgment will be denied.

23

### b. Lt. Redmond

Lt. Redmond, as a supervisory official, cannot be held liable for a failure to train or supervise because post-incident ratification cannot impart liability on a supervisor. <u>Hobart</u>, 916 F.Supp.2d at 799. Further, though liability may sometimes be imposed where a supervisory official is unaware of certain policies, thus obviously fails to train officers on those policies, such liability does not exist here because there is only evidence that Lt. Redmond failed to uphold and/or was unaware of TPSO's policy on altering service weapons. <u>Santibanes v. City of Tomball, Tex.</u>, 654 F.Supp.2d 593, 615 (S.D. Tex. Sept. 4, 2009). As this Court has already held, the alteration of Deputy Phebus's weapon did not cause a constitutional injury, therefore there can be no § 1983 liability based on the alteration. Accordingly, the Court will grant summary judgment on all § 1983 claims against Lt. Redmond based on all excessive force.

### B. Section 1983 Claims Based on Fourteenth Amendment Violation (Denial of Medical Care)

"After the initial incidents of seizure have concluded and an individual is being detained by police officials but has yet

to be booked, an arrestee's[9] right to medical attention, like
that of a pre-trial detainee, derives from the Fourteenth
Amendment. " Nerren v. Livingston Police Dep't, 86 F.3d 469, 473
(5th Cir. 1996)(footnote added). "The Due Process Clause of the
Fourteenth Amendment guarantees that a person detained by police
is entitled to medical care." Carter v. Reich, 399 Fed. Appx.
941, 942 (5th Cir. 2010). "Officers violate that right if they
are deliberately indifferent to a serious illness or injury. A
showing of deliberate indifference requires a showing that the
defendant subjectively knew of a substantial and significant risk
and that he effectively disregarded that risk." Jacobs v. West
Feliciana Sheriff's Dep't., 228 F.3d 388, 395 (5th Cir. 2000).

**1. Lt. Redmond**

Lt. Redmond cannot be found liable for a violation of the
Fourteenth Amendment based on denial of medical care because Lt.
Redmond was not present on the scene when Dee Jay required
medical care. Dee Jay was wounded shortly after 3:00 a.m., and
paramedics arrived not long thereafter at which time they
pronounced Dee Jay dead on arrival. (Acadian Ambulance Medical

---

[9] Recall from above that  Dee Jay was "seized" or "detained" by either
(a) intentionally being shot by Deputy Phebus, or (b) by intentionally having
a weapon pointed at him;" therefore, he is an arrestee that is granted this
right to medical care. See, Flores v. City of Palacios, 381 F.3d 391,396 (5th
Cir. 2004)("An officers seizes a person when he, by means of physical force or
show of authority, has in some way restrained the liberty of a citizen"
through means intentionally applied.)

Rec., Rec Doc. 160-10, pps. 2-3) Based on  logs of the scene, however, Lt. Redmond did not arrive to the scene until around 5:00 a.m., at which time there was no need for medical care, thus no duty to provide care. (TPSO Crime Log, Rec. Doc. 160-11, p.4)

### 2. Deputy Phebus

Deputy Phebus was clearly present at the scene when Dee Jay was wounded; therefore, it is possible that he had a duty to provide medical care. The evidence adduced herein, however, indicates that there was not a substantial and serious risk to which Deputy Phebus should have responded because other officers on the scene were handling Dee Jay's medical care. Sergeant Schirra Finn ("Sgt. Finn") deposed that, after Deputy Phebus's weapon discharged, Sgt. Finn approached Marquis Martin to retrieve a weapon from his pants and then immediately called paramedics for Dee Jay. (Finn Depo., Rec. Doc. 160-7, p.2, lns. 18-19). Deputy Banks deposed that he also called paramedics and watched over Dee Jay until paramedics arrived, but was unable to render care due to the hostile crowd rushing the scene. (Banks Depo., Rec. Doc. 160-6, pps. 5-6) Therefore, the evidence shows that Deputy Banks and Sgt. Finn were handling Dee Jay's care. As such, summary judgment will be granted on all § 1983 claims based on a violation of the duty to provide medical care to a pre-trial detainee. If the Court were to hold otherwise, it would create an

26

inefficient standard requiring all officers to cease what they are doing in order to handle a single person's medical care even in the face of other exigent needs.

**C. State Law Claim for Negligent Hiring**

Defendants do not seek the dismissal of any of Mr. Galmon's state law claims except for any claim for negligent hiring. As Mr. Galmon aptly points out, however, Defendants did not brief this issue, and, even though the Court has found that TPSO's hiring decision is not unconstitutional, Plaintiff has provided enough evidence to survive summary judgment on a state law negligence claim.

Accordingly,

**IT ORDERED** that Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Mr. Galmon's 42 U.S.C. § 1983 claims against Lieutenant Steven Redmond are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that, inasmuch as Mr. Galmon's 42 U.S.C. § 1983 claims are based on: (1) a denial of medical care in violation of the Fourteenth Amendment, or (2) deliberate indifference in hiring, Mr. Galmon's claims are **DISMISSED WITH PREJUDICE.**

Plaintiff will be allowed to proceed on: (1) 42 U.S.C. §

27

1983 claims  based on excessive force against Deputy Phebus in his individual capacity; (2) 42 U.S.C. § 1983 claims against Sheriff Edwards in his official capacity based on excessive force and failure to supervise/train; and (3) all state law claims.

New Orleans, Louisiana this 17th day of March, 2014.


_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE